325 So.2d 727 (1976)
Mrs. Vera Donley Wunstell, wife of Billy Maurice WUNSTELL, and natural mother of Shantell Donley
v.
Mrs. Eleanor Crochet, widow of Joseph CROCHET.
No. 6301.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1976.
Dunn & Rasch, J. Morris Dunn, III and Michael H. Rasch, Metairie, for plaintiffs-appellants.
Lemle, Kelleher, Kohlmeyer & Matthews, Paul B. Deal, New Orleans, for defendant-appellee.
Before REDMANN and LEMMON, JJ., and BOURG, J. Pro Tem.
LEMMON, Judge.
Plaintiff has appealed from a judgment, rendered after trial on the merits, which dismissed her suit against her lessor for the wrongful death of her infant child.
*728 Plaintiff and her present husband had leased a two bedroom apartment owned by defendant, which had the following floor plan:

*729 The apartment was heated by a floor furnace located in the hall which connected the two bedrooms and the bath. The thermostat for the furnace was located in the master bedroom, which also contained a large window air conditioning unit that provided cooling for the entire apartment.
Defendant lit the pilot light for the floor furnace when plaintiff and her husband moved into the apartment in February, 1972, and the tenants used the heating system during cold weather thereafter without incident. When warmer weather began, they did not turn off the furnace, but simply moved the thermostat to its lowest setting of 55. The themostat did not have an on-off switch.
On the evening of May 12, 1972 plaintiff and her husband went to sleep with the door to the hall closed, the door to the kitchen covered with a quilt, and the air conditioning unit running. When they awoke the nest morning, they discovered that the child's bedroom was excessively hot and that the furnace had been in operation for some period of time, although plaintiff's husband found the thermostat still set at 55. The limp child was rushed to the hospital and eventually recovered.
Defendant theorized on a "common sense" basis that cooling the bedroom with the large air conditioning unit had activated the thermostat and that the cool temperature maintained in the closed room had caused the furnace to run all night.[1] She warned the tenants not to close off the bedroom completely when operating the cooling unit.[2]
On the night of June 13, 1972 plaintiff and the child were at home alone. Plaintiff put the child to bed and closed off the master bedroom, with the air conditioning unit running. When her husband returned from work the next morning, they discovered that the floor furnace was operating and had apparently run for a long period of time, and that the child had died from the excessive heat.[3]
This action ensued. The trial judge dismissed the suit on the basis that the "death resulted . . . from an unfortunate series of events precipitated by a mistake of judgment by plaintiff."
Plaintiff seeks reversal, contending that (1) the thermostat and/or furnace was defective and (2) the placement of the furnace outside of the master bedroom, with the thermostat in the bedroom and in the direct line of flow of cool air, was a hazard which rendered the premises unsafe.
Plaintiff did not prove a defect in the thermostat or the furnace. The mechanical engineer that she presented had not inspected the premises or the equipment. The engineer employed by defendant to test the equipment found the thermostat and furnace in satisfactory operating condition. Defendant furthermore testified that the unaltered system was still operating without problems at time of trial.
*730 As to plaintiff's second contention, we emphasize that the child's death resulted from a second of two incidents involving almost identical circumstances.
If the child had died following the first incident, defendant would probably have been liable on two bases. First, defendant breached her duty as lessor to provide safe premises, inasmuch as a hazard existed in the apartment because of the location of the thermostat, particularly at the change of seasons when weather conditions could call for either heating or cooling. This hazard, moreover, was not readily apparent to a reasonable tenant.
Second, strict liability (in the sense that liability does not depend upon proof of defendant's negligence or of her knowledge of the defect) is imposed upon an owner-lessor of premises for injury sustained because the premises are defective. Fault is analogized from the conduct required by C.C. art. 2322, and responsibility for the fault-caused damage attaches under C.C. art. 2315. Langlois v. Allied Chemical Corp., 258 La. 1067, 249 So.2d 133 (1971); see also the specific language in dissenting opinion in Wooten v. Wimberly, La., 272 So.2d 303, 309 (1972).
After the first incident, defendant did not discharge her duty to provide safe premises by simply instructing the tenants to keep the master bedroom door open. She had a duty to go forward and remedy the hazard. Nevertheless, we conclude that defendant's failure to act affirmatively in remedying the hazard does not create liability in this plaintiff under the circumstances of this particular case, since the premises were only potentially hazardous without concurrent willful action on the part of the plaintiff.
Rules of law impose certain duties designed to protect certain persons against certain risks under certain circumstances.[4]Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Malone, Ruminations on Cause-In-Fact, 9 Stanford L.Rev. 60, 73 (1956). The scope of the duty imposed upon a defendant marks the extent of his liability; risks falling outside the scope of this duty fall on the victim (unless another defendant is liable). And where the defendant's duty ends, the assumption of risks by the victim begins. In this sense assumption of risks is but the negative of duty. Green, Assumed Risk as a Defense, XXII La.L.Rev. 77 (1961).
In the present case the potentially dangerous heating system required concurrent action on the part of the tenant before harm would be produced. The key inquiry as to whether the risk fell within the scope of defendant's duty for liability purposes (or as to whether the risk was assumed for defense purposes) is whether plaintiff took the action she did voluntarily and with knowledge of the possible consequences.
The first incident dramatically illustrated to plaintiff and her husband the risk of operating the air conditioning unit in the closed bedroom with the thermostat for the hearing system merely turned to a low setting. They were also warned by defendant (after she realized the danger because of the first incident) to avoid creating the same combination of circumstances. Nevertheless, on the night of her child's death, plaintiff in order to make herself more comfortable not only created the exact same circumstances as had existed in the previous incident, but also failed to take any precautions whatsoever (such as opening the child's window) to prevent the same result. Perhaps she did not understand the mechanics of the forces set into operation by her action, but she had to be aware of the possible consequences by the *731 result so forcefully demonstrated only a short time before. Plaintiff acted in such a manner as to invite injury by voluntarily and unreasonably exposing her child to harm from the exact risk known by her to result when she created that combination of circumstances. In effect, she accepted or consented to the risk.
As to whether her consent to the risk was voluntary, plaintiff argues that they would have moved after the first incident but were compelled to remain in the apartment because they had no money and her husband was out of a job. The important factor in plaintiff's consenting to the risk was not her staying in the apartment, but rather her operating the air conditioning unit as a matter of convenience under the same circumstances as had previously existed when the child was previously exposed to excessive heat.[5]
We perceive two approaches to resolution of the liability question. From the duty-risk approach, we note that defendant's duty did not encompass protection of this particular plaintiff against this particular risk under these particular circumstances (although defendant's substandard conduct may have constituted a breach of duty to others). From the assumption of risk approach (and this defense was specifically pleaded), plaintiff was fully aware of the risk already created by defendant's negligence and knew her action could produce a disastrous result; yet, she voluntarily proceeded to encounter the risk.[6] Prosser, The Law of Torts § 68 (4th ed. 1971); Restatement, Second, Torts § 496 C (1965). We do not choose one approach over the other; under either, defendant is not liable for plaintiff's damages.
The judgment is affirmed.
Affirmed.
REDMANN, Judge (dissenting).
At worst, plaintiff's closing off her own bedroom with the air conditioner running was contributory negligence (and in that sense only might be called assumption of risk). But contributory negligence is not a defense against strict liability, Langlois v. Allied Chem. Corp., 1971, 258 La. 1067, 249 So.2d 133. Only when it amounts to consent to be injured is assumption of risk a defense against strict liability. It is not reasonable to assert that plaintiff's disbelief in defendant's "common sense" explanation of the near-fatal event a month earlier, or plaintiff's forgetfulness, or even plaintiff's stupidity constituted consent on her part to suffer the death of her infant.
NOTES
[1] At trial a mechanical engineer confirmed that this theory was a plausible explanation of the occurrence. He opined further that the stream of air, discharged from the cooling unit at 46 to 50 directly toward the thermostat, could also produce this result. Testing revealed that the thermostat was four to seven degrees off calibration and would be activated at a higher temperature than that indicated on the dial of the instrument.
[2] Defendant testified that when she advised plaintiff and her husband to turn off the furnace, the husband told her he liked to use the heating on cool mornings.

Plaintiff's husband denied telling this to defendant, insisting he asked defendant to have the furnace checked or turned off. He admitted, however, that defendant warned him about closing off the bedroom, but claimed he didn't understand the significance, thinking the occurrence was a freak accident.
[3] There was no direct medical proof of the cause of death, but on the issue of causation a policeman called to the scene stated "you couldn't hardly breathe when you went into the room."
[4] Perhaps the pertinent inquiry is whether this particular defendant was under a duty to protect this particular plaintiff against this particular risk, since the plaintiff was in at least an equal position to protect herself.

In a comparative negligence jurisdiction plaintiff would be held to be at least 50% at fault.
[5] We distinguish this case from one, for example, in which a slum landlord provides only a rickety stairway as a means of entrance and the improverished tenant is injured when the obviously unsafe stairway gives way. In such a case the tenant, although aware of the risk of injury, does not voluntarily consent to subject himself to this risk, but virtually has no freedom of choice, since this is his only means of entrance.

In the present case plaintiff was not forced to choose between two unreasonable alternatives. She had no compelling reason to operate the air conditioning unit, except for her own comfort, before steps were taken to make the system safe.
[6] Since plaintiff's conduct in voluntarily encountering the known risk was unreasonable, the conduct also amounted to contributory negligence.

Although contributory negligence (which is measured by the objective standard of the reasonable man) is not a defense to strict liability, assumption of risk (which is controlled by the subjective intent of the plaintiff) is. Langlois v. Allied Chemical Co., supra; Restatement, Second, Torts §§ 515 (pertaining to the strict liability of the possessor of an animal), 524 and 525 (pertaining to strict liability for abnormally dangerous activity).