395 So.2d 888 (1981)
Milton L. SMITH and Ann Janette Palmer Smith, Individually and d/b/a Smith's Furniture & Appliance, Plaintiffs-Appellees,
v.
The TOWN OF LOGANSPORT and Maryland Casualty Company, Defendants-Appellants.
No. 14439.
Court of Appeal of Louisiana, Second Circuit.
February 16, 1981.
Rehearing Denied March 27, 1981.
*889 Gamble & Sledge by Claude R. Sledge, Mansfield, for plaintiffs-appellees.
Cook, Yancey, King & Galloway by Herschel E. Richard, Jr., Shreveport, for defendant-appellant Maryland Casualty.
Wilson & Veatch by Barry G. Feazel, Shreveport, for defendant-appellant Town of Logansport.
Before HALL, MARVIN and JASPER E. JONES, JJ.
En Banc. Rehearing Denied March 27, 1981.
JASPER E. JONES, Judge.
Defendants, the Town of Logansport and its insurer, Maryland Casualty Co., appeal a judgment against them awarding plaintiffs, Milton L. and Janette P. Smith, a judgment for damages allegedly caused by defendant's negligence and/or strict liability in maintenance of a town water line. We reduce the general damage awards for mental anguish and as amended affirm.
Plaintiffs are the owners and operators of a retail furniture and appliance store located in downtown Logansport. Plaintiffs own the building in which the store is located. At approximately 10:30 a. m. on June 2, 1977, plaintiffs noticed water leaking through the floor of their store. After turning off his water supply, which did not curtail the flooding, Milton Smith went to Town Hall and requested the town utility office to summon D. W. Boyd, Maintenance Superintendent for the town. Whey Boyd arrived at Smith's furniture store, and after he confirmed that Smith's service line was not involved, he then ordered the master valve cut off at the town's water tank in order to stop the flow of water into Smith's store. Before Boyd got the water cut off, however, water began coming out of a newly appeared 25 to 30 ft. crack in the floor of the store, and according to Smith began spewing "just like a small sprinkler system," up to 2 feet high. Smith, his wife, employees, and neighbors had to carry all the furniture and appliances out of the store to minimize water damage. A great deal of confusion ensued and furniture was stored haphazardly in a nearby building. Smith testified the water flow continued for 2½ to 3 hours. Boyd testified he had the water cut off quicker than that. Smith stated the entire warehouse and the west side of the showroom were covered with water at a level above one's ankles. Smith had 5 steel support beams, called trusses, in the warehouse portion of the building. About ½ to 1 hour after the water flow began, Smith placed two 2 × 4's under the center truss because he believed the ceiling was falling due to a weight-bearing center wall rising 10 to 12 inches. The wall was allegedly being raised by the concrete floor being pushed up by the water which was accumulating under it. After one 2 × 4 broke plaintiff placed 4 × 4's under all the trusses. Plaintiffs then attempted to pump the water out by means of an electric sump pump dropped into a hole broken through the floor.
Boyd found a 2 in. cast iron pipe which was a main water line of the town running under plaintiffs' building. The pipe was rusted and deteriorated. Boyd admitted the town was responsible for repairing main water lines.
The trial judge found defendants liable in solido for the damage caused by the flooding. He found that the burst water line was part of town's water system which ran under the concrete slab that formed the floor of plaintiffs' store, and the evidence clearly supports these findings. The trial court apparently based its finding of liability upon the strict liability of LSA-C.C. art. 667.[1]
The trial judge awarded plaintiffs $1,002.62 as miscellaneous expenses; $1,082.75 for items destroyed or rendered unusable; $775 as rental expense; $15,000 for repairs to the damaged building; $25,000 to Milton Smith for anxiety, worry, depression and injuries; and $5,000 to Janette Smith for emotional mental strain. He *890 awarded Milton Smith $913.50 for medical expenses.
Defendant assign as error (1) the trial court's finding of liability, (2) the trial court's award to Milton Smith of $25,000 and to Janette Smith of $5,000 for mental anguish, (3) the trial court's award of $15,000 for repairs, and (4) the trial court's award of $1,082.75 for items destroyed or made unusable by the water.
LSA-C.C. art. 667 has frequently been the basis for holding municipalities liable for damages caused by improper functioning sewer systems. See Romero v. Town of Welsh, 370 So.2d 1286 (La.App. 3d Cir. 1979). Municipalities have been held to strict liability, in the absence of any proof of negligence, under LSA-C.C. art. 667 for damage sustained by a property owner due to the overflow of city sewer lines. Carr v. City of Baton Rouge, 314 So.2d 527 (La. App. 1st Cir. 1975); Falgout v. St. Charles Sewerage District No. 3, 351 So.2d 206 (La. App. 4th Cir. 1977). Recovery has been allowed under LSA-C.C. art. 667 against the state and/or its agencies when flooding caused by public works damages private property. See our recent decision in Semon v. City of Shreveport, 389 So.2d 438 (La. App. 2d Cir. 1980), in which we affirmed a judgment holding the state and the City of Shreveport strictly liable under LSA-C.C. art. 667 for the flooding of plaintiff's residence which was caused by the construction of an 1-220 ramp nearby. We held that the state and its agencies are within the purview of the term proprietor used in LSA-C.C. art. 667 and are strictly liable under this Article when damages to private property are caused by the carrying out of public works, regardless of the lack of negligence on the part of the state or its agency. See also J. B. LaHaye Farms, Inc. v. La. Dept. of Hwys., 377 So.2d 1286 (La.App. 3d Cir. 1979), which allowed recovery under LSA-C.C. arts. 660 and 667 for flooding caused by the defendant-Department's improvement of a nearby highway.
In Lombard v. Sewerage & Water Board of N. O., 284 So.2d 905 (La.1973), the rationale of LSA-C.C. art. 667 liability was elaborated upon as follows:
"In Chaney v. Travelers Insurance Co., 259 La. 1, 249 So.2d 181 (1971), we recognized the rule to be applied to these cases as follows:
`Article 667 is therefore a limitation the law imposes upon the rights of proprietors in the use of their property. It is a species of legal servitude in favor of neighboring property, an expression of the principle of sic utere. An activity, then, which causes damage to a neighbor's property obliges the actor to repair the damage, even though his actions are prudent by usual standards. It is not the manner in which the activity is carried on which is significant; it is the fact that the activity causes damage to a neighbor which is relevant. This being ascertained, it remains only to calculate the damage which ensued.'" Id. at 912.
Here, the main water line was owned, operated, and controlled by the town. When it burst, it caused damage to plaintiff's property, damage for which the town and its insurer are strictly liable under LSA-C.C. art. 667, regardless of their prudence in maintaining the line. The town's function in providing water was a work which caused damage to a neighboring property owner.
In the recent supreme court case of Jones v. City of Baton Rouge, 388 So.2d 737 (La. 1980), strict liability has been imposed under LSA-C.C. art. 2317[2] upon the state and other public bodies for defective things in the custody of the state or other public body which cause damage. Stablier v. City of Baton Rouge, 393 So.2d 148 (La.App. 1st Cir. 1980), has applied Jones, supra, and LSA-C.C. art. 2317 to hold the City-Parish of East Baton Rouge liable for damages *891 caused by a leaky storm drain pipe. In Stablier, supra, plaintiff-wife was injured when a leaky storm drain pipe allowed the dirt in between the public sidewalk and the street to be eroded and absorbed into the pipe. An underground chasm was formed, and the ground suddenly collapsed under plaintiff-wife as she was riding a lawnmower over this area. The First Circuit agreed with the trial court that the pipe was in the custody of defendant, was defective, and caused plaintiff's damages.
The appellants are liable under LSA-C.C. arts. 667 and 2317. The water line was in the custody of appellant, Logansport (as part of the town's water system), it was defective (because it broke and flooded plaintiffs' building), and it caused plaintiffs' damage. There is no evidence to show that plaintiffs' damages were caused by their own fault, the fault of a third person or an irresistible force, and thus they have no defense. Therefore, defendants are also strictly liable for the damage caused to plaintiffs under LSA-C.C. art. 2317.
Defendants complain the $25,000 awarded Milton Smith for mental anguish and the $5,000 awarded Janette Smith for mental anguish are grossly excessive and that the trial court abused its discretion in making these awards.
The guidelines laid down in Reck v. Stevens, 373 So.2d 498 (La.1979), require us to examine the facts of this particular case to decide whether they reveal a clear abuse of the trial court's discretion.
"It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered ... excessive ..." Id. at 501.
Mr. Smith did not seek any medical attention until August of 1978, some 14 months after the flood. His wife testified that he was nervous and could not sleep after the flood and was experiencing stomach pains, but these symptoms were obviously not of great urgency, for Mr. Smith did not visit a doctor until over a year later. Mr. Smith went to see Dr. Jerome Snyder, who, after an upper gastro-intestinal series, diagnosed an ulcer. Dr. Snyder believed the ulcer was causally related to the store's flood. It is important to note that although Smith felt he was going bankrupt and the store was losing business, in reality his store did better the year of the flood than in all its previous years of operation with higher sales, higher gross profit, higher net profit, and higher net profit percentages, and with a decidedly lower bad debt percentage. Smith's business was open for business the entire time and never closed except on the day of the flood. The medicine prescribed by Dr. Snyder gave Smith relief, according to Smith, his wife, and Dr. Snyder, making it clear that if Smith had gone to a doctor earlier he would have obtained relief sooner. Dr. Snyder also testified that Smith had no symptoms of depression and no problems with impotency when he saw him in August of 1978.
Dr. George Seiden, a psychiatrist, opined that Smith was suffering from a depressive neurosis which was causally related to the flood. Dr. Seiden, however, only saw Smith one time for 1 hour in September, 1979, a few months before the trial. Smith was not referred to Dr. Seiden by Dr. Snyder but by his lawyer. Dr. Seiden importantly noted that the actual damage or loss that plaintiff suffered was not nearly as important as what plaintiff felt he lost or suffered.
Though there are 118 pages of Mr. Smith's testimony in the record his following statements reflect the only portion of his testimony that relates to his mental anguish claim:
"The day I called Mr. Boyd's boss and he told me that the insurance company wasn't going to pay nothing, and I had an old sick headache and I began to hurt from exhaustion before then, but I still felt like that right is right and wrong is wrong, and you don't have to fear about it, and I was hurting and my wife and Mrs. Bennett and Mr. Boyd told me they would take
Q. The fact that you had to borrow money, did that bother you?

*892 A. Yes, it did.
. . . . . .
Q. What else was bothering you, what else was on your mind?
A. Well, it got on my mind that I was going bankrupt.
. . . . . .
And then I got scared because I was switching money, which is the worst practice a business can do...
... the ninety days was up, I would pay for that that was sold, and which was wrong, and it was driving me nuts, because if it had all caught me I was bankrupt.
Q. This worry over your business did it have an effect on your personal life with your wife and family?
A. We had a perfect marriage, and we liked to have got a divorce; we had been married 25 years." Id. Tr. 533-535.
Based on the above articulated circumstances we find that the trial court abused its discretion in awarding Smith $25,000.
Mental anguish damages are recoverable in cases in which the defendant is strictly liable for the damage caused to plaintiff's property. See Carr v. City of Baton Rouge, supra; Falgout v. St. Charles, supra; Romero v. Town of Welsh, supra.
In Romero, supra, damages for mental anguish due to the backup of sewerage into plaintiff's home were awarded in the amount of $2,500.
In Carr v. City of Baton Rouge, supra, plaintiff-wife was awarded $500, for mental anguish suffered as a result of a backup of sewerage into her home.
Falgout v. St. Charles, supra, affirmed an award of $7,500 for mental pain for the backup of sewerage into the home and lawn.
In Barbay v. Parish of East Baton Rouge, 343 So.2d 235 (La.App. 1st Cir. 1977), awards of $2,500 to each of the two plaintiffs were affirmed for mental anguish and embarrassment they suffered when raw sewage backed into their home.
Awards for mental anguish of $1,500 to each of the two plaintiffs were denominated high but within the trial judge's discretion in Moreland v. Acadian Mobile Homes Park, Inc., 313 So.2d 877 (La.App. 2d Cir. 1975). Sewage in this case had flowed onto plaintiffs' property.
More recently in Semon, supra, we affirmed a $2,500 mental anguish award to a plaintiff whose home had been flooded. The court here stressed the fact that plaintiff had a serious heart condition. He was present in his home and watched the water enter when it flooded.
In LaHaye Farms, supra, the Court of Appeal granted a $3,000 award for mental anguish suffered by plaintiff whose fields were flooded and crops damaged by defendant's acts.
A $5,000 award in Hymel v. Tom Alexander Brokerage Co., 348 So.2d 104 (La.App. 4th Cir. 1977), was called high but was affirmed for a 78-year old woman who was present in her home when it was hit by a truck and who thereafter suffered depressive psychosis.
In Elston v. Valley Electric Membership Corp., 381 So.2d 554 (La.App. 2d Cir. 1980), we affirmed an award of $5,000 to plaintiff-wife who had recurrent nightmares after her home and appliances were damaged by electricity due to a malfunctioning transformer.
The 70-year old plaintiff in Mayer v. McNair Transport, Inc., 384 So.2d 525 (La. App. 2d Cir. 1980), who suffered extreme mental trauma when her home was destroyed in her presence by fire caused by the overturning of a truck, received $18,500 for her mental anguish. The case is distinguishable in that plaintiff suffered severe attacks of hyperventilation resembling heart attacks and made frequent trips to the doctor.
Considering the mass of the above similar cases, we find that the highest award that the trial court could have within its much discretion awarded Milton Smith is the sum of $7,500 and we reduce his mental anguish award to this amount. Mrs. Smith *893 received $5,000 for her mental anguish. However, the record fails to clearly reflect any mental anguish suffered by her on account of the store's flood. The only mental anguish she testified to was worry over her husband's mental anguish. She never saw a doctor for any problem. On the day of the flood, which according to Mrs. Smith was "very, very hot", she was moving mattresses and passed out. For this physical injury and whatever mental anguish she may have suffered due to the flooding of the store, she is entitled to a maximum of $1,500 and we therefore reduce the $5,000 award to $1,500.
Defendants also complain of the award of $15,000 for the repair of the building. Defendants complain that the $15,000 awarded plaintiffs for repair to the building is an abuse of discretion and should be lowered to $5,928.78. This case presents a clear application of Canter v. Koehring Co., 283 So.2d 716 (La.1973) and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), because there was a complete conflict between plaintiffs' expert witnesses and defendants' expert witnesses. As stated in Canter, supra, at 724:
"... where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
Plaintiffs also point out Sahuque Realty Co. v. Employers Commercial Union Ins. Co. of America, 327 So.2d 563 (La.App. 4th Cir. 1976), affirmed 330 So.2d 617 (La.1976), in which it was stated at p. 566 as follows:
"Where there is a legal right to recovery but damages cannot be exactly estimated the trial court has reasonable discretion to assess such damages based on the facts and circumstances of the case. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971). Where damages cannot be precisely and mathematically determined the trial judge is vested with reasonable discretion in making awards for damage. Lou-Con, Inc. v. Gulf Building Services, Inc., 287 So.2d 192 (La.App. 4th Cir. 1973), writ refused 290 So.2d 901 and So.2d 899 (La.1974). Where there is considerable variance in estimated damages which render calculation thereof difficult, much discretion is accorded to the trial judge to determine the amount of the award. American Ins. Co. v. Richard, 212 So.2d 481 (La.App. 3d Cir. 1968), writ refused 252 La. 949, 215 So.2d 125. See also Nickens v. McGehee, 184 So.2d 271 (La.App. 1st Cir. 1966), writ refused 249 La. 199, 186 So.2d 159."
Plaintiffs' expert, John E. Cagle, Jr., a civil engineer, testified that the water caused the floor to raise up, which pushed up the trusses, which in turn pushed up the roof. Cagle also testified to a crack in the east wall caused by the flood as well as a 3 inch movement from the edge of the wall to the top layer of the concrete blocks at the roof level caused by the flood. Cagle felt that the best way to repair would be to remove the slab and pour a new one.
In direct contrast to this testimony was the testimony of Clifton A. Frey, Sr., defendants' expert who is a civil, mechanical, and electrical engineer. He testified that the crack in the east wall was not causally related to the flood and that the cracks in the west wall were typical shrinkage cracks. He found no structural damage to the floor and asserted the slab could support 500 lbs. per sq. ft. He found no movement of the floor slab sufficient to move the roof.
Maloff Ivey, plaintiffs' expert general contractor, gave an estimate of $38,000 to tear out and replace a concrete area in the back of the store, to remove and rebuild several interior walls, to replace a 12 ft. × 14 ft. area carpet, to replace the roof in a 60 ft. × 60 ft. area, and to repair cracks in the wall.
*894 J. Harris Durham was defendants' expert contractor. He estimated the cost of tearing out the concrete floor and reinstalling a concrete slab to be $4,294.60. He estimated the cost to repair a 60 ft. × 60 ft. area on the roof to be $1,634.37.
As can be seen by the above review of the experts' testimony, it is in hopeless conflict. The trial judge was in the best position to determine which witness to believe. It is peculiarly his province to decide the credibility of the witnesses. Additionally, much discretion is afforded the trial judge to determine the amount of the award when there is a large difference in estimated damages, rendering calculation difficult. We cannot say in light of the conflict of testimony among the witnesses, that the trial judge erred in awarding $15,000 for repairs to the building.
Defendants also complain of the award of $1,082.75 for unusable or destroyed merchandise, claiming that an addition of the value of these items does not add up to $1,082.75. However, we have examined the exhibit in question (P-28), and the sum of $1,082.75 is indeed correct.
For the reasons assigned we reduce the mental anguish award of Milton Smith to $7,500 and the mental anguish award to Mrs. Smith to $1,500 and to reflect these reductions we recast the second and third paragraphs of the judgment to read as follows:
ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Milton L. Smith and against the Town of Logansport and Maryland Casualty Company, in solido, in the full sum of TWENTY-SIX THOUSAND TWO HUNDRED SEVENTY-THREE AND 67/100 ($26,273.67) DOLLARS, with legal interest from judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Ann Janette Palmer Smith and against the Town of Logansport and Maryland Casualty Company, in solido, in the full sum of ONE-THOUSAND FIVE-HUNDRED AND NO/100 ($1,500.00) DOLLARS, with legal interest from judicial demand until paid.
As AMENDED the judgment is AFFIRMED. We cast appellees with all costs of appeal.
NOTES
[1] LSA-C.C. art. 667"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
[2] LSA-C.C. art. 2317"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."